**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                   CRIMINAL ACTION NO. 2:25-cr-00039

GARY W. JACKSON,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Gary W. Jackson's ("Defendant") Motion to Dismiss. (ECF No. 29.) For the reasons discussed herein, the motion is **DENIED**.

### *I.     BACKGROUND*

This case arises out of Defendant's conduct on August 9, 2023, December 6, 2023, April 23, 2024, May 15, 2024, and May 21, 2024. (ECF No. 1.) Specifically, Defendant allegedly distributed meth on the first four dates and unlawfully possessed a firearm on the last date. (*See id.*)

On May 21, 2024, and May 22, 2024, criminal complaints were filed against Defendant in the Kanawha County, West Virginia Magistrate Court. (ECF Nos. 29 at 2; 36 at 2.) Defendant was charged with, *inter alia*, distributing meth. Defendant was released on bond on May 22, 2024. (*See* ECF Nos. 29 at 3; 31 at 1; 36 at 2.)

1

Without much pause, Defendant was then arrested again on May 24, 2024, for more charges in the Kanawha County Magistrate Court. (ECF No. 36 at 2.) Those charges were for alleged kidnapping, strangulation, and unlawful possession of a firearm. (*Id.*) The kidnapping and strangulation charges were later dismissed. (*Id.* at 2–3.) Defendant was again released on bond on June 3, 2024. (*Id.* at 2.)

Defendant was arrested again on June 22, 2024, for charges filed in the Kanawha County Magistrate Court. (ECF No. 36 at 3.) He was charged with malicious wounding, battery, and brandishing a knife. (*Id.*) On June 24, 2024, Defendant was again released on bond but was required to appear on July 2, 2024, for his preliminary hearing. (*Id.*)

Defendant failed to appear for his preliminary hearing. (ECF No. 36 at 3.) As a result, a capias warrant was issued for his arrest. (*Id.*)

Then, Defendant travelled to Kentucky and, on September 21, 2024, was arrested for charges in Boyd County Circuit Court in Catlettsburg, Kentucky (the "Kentucky charges"). (ECF Nos. 29 at 3; 36 at 3.) He was charged with four felonies and three misdemeanors, involving public intoxication and assault, among others. (ECF Nos. 29 at 3; 31 at 2.) Defendant was released on bond the next day after falsely using a relative's name. (ECF No. 36 at 3.)

Defendant travelled back to Charleston, West Virginia, where he was arrested on his Kanawha County Magistrate Court capias on September 24, 2024. (*Id.*) On September 25, 2024, the state of Kentucky lodged a detainer (the "Kentucky Detainer") against Defendant with the South Central Regional Jail ("SCRJ"), stating that Kentucky would extradite Defendant. (*See* ECF No. 36 at 3–4; ECF No. 31-2.)

Then, on March 18, 2025, the federal indictment in this case was filed for Defendant's alleged meth distribution and unlawful possession of a firearm in August 2023 through May 2024. (ECF No. 1.)   The next day, the United States Attorney's Office ("USAO" or "Government") lodged a detainer against Defendant with the SCRJ, which directed SCRJ to notify the USAO when Defendant is sentenced ("first federal detainer").   (ECF No. 36 at 4; ECF No. 31-1.) Defendant claims this detainer was never served upon him.   (ECF No. 36 at 4.)

On April 24, 2025, Defendant pleaded guilty to a misdemeanor battery charge, and all other West Virginia state charges against him were dropped.   (*Id.*; ECF No. 31 at 1.)   He was sentenced to 12 months incarceration, which was satisfied by time served.   (ECF Nos. 36 at 4; 31 at 1.)

Defendant was then returned to Kentucky.   (ECF Nos. 36 at 4; 31 at 2.)   At some point, Defendant allegedly procured sufficient funds for bond but was denied release.[1]   (ECF No. 29 at 3.)   He ended up being detained in Boyd County Detention Center ("BCDC") for about a year before he pleaded guilty to and was sentenced on the Kentucky charges on February 12, 2026. (*See id.*; ECF No. 31 at 2.)   He was sentenced to five years imprisonment to run concurrently with any sentence ultimately imposed in this case.   (ECF Nos. 29 at 3; 31 at 2; 36 at 4–5.)

Then, the Government lodged a detainer against Defendant with BCDC on February 19, 2026 ("second federal detainer").   (ECF Nos. 31 at 2; 36 at 5; *see also* ECF Nos. 31-4, 31-5.) This detainer was served upon Defendant, who asserted his rights to a speedy trial.   (ECF Nos. 31 at 2; 36 at 5; *see also* ECF Nos. 31-4, 31-5.)   On February 20, 2026, the Government filed a motion for a detention hearing.   (ECF No. 7.)   That motion was granted, (ECF No. 8), and

---

[1] Defendant claims that he was denied release based on the pending federal detainer.   (ECF No. 29 at 3.)   However, the Government did not lodge a detainer against Defendant with BCDC until February 19, 2026.   (*See* ECF Nos. 31-4, 31-5.)

3

Defendant had his initial appearance on March 23, 2026, (ECF No. 15).   At his initial appearance, Defendant was appointed a federal public defender to represent him.   (*See* ECF No. 17.)

On April 27, 2026,[2] Defendant filed the pending Motion to Dismiss based on alleged violations of the Fifth and Sixth Amendments of the United States Constitution.[3]   (ECF No. 29.) The Government filed a response, (ECF No. 31), and Defendant filed a reply and a supplement to his reply, (ECF Nos. 36, 40).[4]   The Court held a hearing, at which all parties were present and had the opportunity to be heard.   (ECF No. 38.)

As such, this motion is fully briefed and ripe for adjudication.

## II.    DISCUSSION

Under the Sixth Amendment, defendants in criminal prosecutions "shall enjoy the right to a speedy and public trial."   U.S. Const. amend. VI.   "In order to properly assess whether a pretrial delay contravenes the Constitution's speedy trial guarantee, the Court must consider four factors: (1) the length of delay; (2) the reasons therefor; (3) the timeliness and vigor of the assertion of the speedy trial guarantee; and (4) prejudice to the defendant."   *United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009) (outlining the "*Barker* test" of *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). The first factor also doubles as a threshold requirement.   "Simply to trigger a speedy trial analysis,

---

[2] Defendant initially filed a *pro se* motion on March 13, 2026, (ECF No. 13), which sought discovery and appointment of counsel and asserted his right to a speedy trial.   Defendant's counsel clarifies that this motion is now "effectively moot."   (ECF No. 36 at 1.)   Thus, this *pro se* motion, (ECF No. 13), is **DENIED AS MOOT**.

[3] Defendant's motion clearly states that he "moves to dismiss his indictment for violating both his statutory rights under the Speedy Trial Act . . . as well as his constitutional rights guaranteed by the Sixth and Fifth amendments to the United States' constitution."   (ECF No. 29 at 1.)   However, Defendant later claims that his motion "is not based on violation of the Speedy Trial Act itself."   (ECF No. 36 at 1.)   Thus, the Court will not consider any claims or arguments raised relating to the Speedy Trial Act.

[4] Defendant was not afforded the opportunity—and did not move for leave—to file a reply brief under the Local Rules of Criminal Procedure, *see* L.R. Cr. P. 12.1, and the Court has no obligation to consider Defendant's additional submissions.   This Court has already recently reminded Defendant's counsel of such.   *See United States v. Gould*, 672 F. Supp. 3d 167, 170, n.2 (S.D. W. Va. 2023), *aff'd*, 146 F.4th 421 (4th Cir. 2025), *opinion superseded on reh'g*, 163 F.4th 795 (4th Cir. 2026), *and aff'd*, 163 F.4th 795 (4th Cir. 2026).   The Court will consider Defendant's additional submissions in this matter, but counsel is AGAIN advised to seek leave of court before filing a reply brief.

an accused must allege that the interval between *accusation and trial* has crossed the threshold dividing ordinary from presumptively prejudicial delay[.]"  *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (internal quotations omitted; emphasis added).   "After the defendant makes this threshold showing, he 'must . . . show on balance,' that the four inquiries weigh in his favor." *United States v. Woolfolk*, 399 F.3d 590, 597 (4th Cir. 2005) (quoting *United States v. Thomas*, 55 F.3d 144, 148 (4th Cir. 1995)).   "The Supreme Court has observed that 'postaccusation delay [is] presumptively prejudicial at least as it approaches one year.'"   *United States v. Burgess*, 684 F.3d 445, 452 (4th Cir. 2012) (quoting *Doggett*, 505 U.S. at 652 n.1).

Here, Defendant satisfied the threshold requirement because the interval between his accusation, which occurred when he was indicted on March 18, 2025, and his initial trial date, which was scheduled for May 26, 2026,[5] exceeds one year.[6]  *See Burgess*, 684 F.3d at 452. However, because the balance of these inquiries does not weigh in his favor, Defendant's Sixth Amendment right to a speedy trial has not been violated.   Each factor is discussed in turn below.

### A.  Length of the Delay

Having shown that the length of the delay was presumptively prejudicial, the Court must determine whether the first factor weighs in Defendant's favor.   *Hall*, 551 F.3d at 271 (noting that the first factor has two components).   Determining the weight of this factor is a "fact-intensive inquiry."   *Woolfolk*, 399 F.2d at 598 (internal quotations omitted).   Although the Supreme Court has acknowledged that complex conspiracy charges justify longer periods of delay than normal

---

[5] This was the scheduled trial date before Defendant filed the pending motion.   (See ECF Nos. 16, 29.)   Defendant then moved to continue the trial, (ECF Nos. 27, 35), which is now scheduled for June 30, 2026, (ECF No. 37).

[6] Curiously, Defendant focuses on the interval between his accusation and his initial appearance.   (*See* ECF No. 29 at 5.)   However, the interval between his accusation and trial is the proper focus, *see Doggett*, 505 U.S. at 651–52, and a stronger argument for Defendant.

street crimes, *see Barker*, 407 U.S. at 531, the critical inquiry is the "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim," *Doggett*, 505 U.S. at 652.

Here, the length of Defendant's approximately 14-month delay just barely meets the minimum needed to trigger judicial examination.  *See Burgess*, 684 F.3d at 452.  However, the Fourth Circuit has found significantly longer delays to be within the bounds of the Sixth Amendment.  *See, e.g.*, *United States v. Grimmond*, 137 F.3d 823, 827 (4th Cir. 1998) (finding no Sixth Amendment violation despite a 35-month delay); *United States v. Thomas*, 55 F.3d 144, 149–150 (finding no Sixth Amendment violation despite a 30-month delay).  While the delays in *Grimmond* and *Thomas* were found to be "uncommonly long," the delay in Defendant's case is much closer to the minimum delay necessary to even trigger a Sixth Amendment analysis.

Therefore, the first factor weighs only slightly in Defendant's favor.

### B.  The Reason for the Delay

In examining the second factor, the "court must carefully examine several issues, specifically focusing on the intent of the prosecution."  *Hall*, 551 F.3d at 272 (citing *Barker*, 407 U.S. at 531.)  Delays "should be characterized as either valid, improper, or neutral."  *Id.* "Deliberate delay to hamper the defense weighs heavily against the prosecution[.]"  *Vermont v. Brillon*, 556 U.S. 81, 90 (2009).  Whereas "[v]alid reasons for delaying a trial are weighed in favor of the government."  *Robinson*, 55 F.4th at 400. Importantly, "delay caused by the defense weighs against the defendant."  *Brillion*, 556 U.S. 81 at 90.

The Fourth Circuit has held that waiting for a state court criminal prosecution to conclude was a valid reason for delay, where the accused was engaged in a pending state prosecution before

being indicted in the federal system.  *See United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1998); *United States v. Thomas*, 55 F.3d 144, 151 (4th Cir. 1995), *cert. denied*, 516 U.S. 903 (1995).  In *Grimmond*, the Fourth Circuit observed that "[w]hen a defendant violates the laws of several different sovereigns, . . . at least one sovereign, and perhaps more, will have to wait its turn at the prosecutorial turnstile.  Simply waiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay."  137 F.3d at 828.  In *Thomas*, the Fourth Circuit explained that, to require the federal government to prosecute an accused before state proceedings have run their course "would be to mire the state and federal systems in innumerable opposing writs, to increase inmate transportation back and forth between the state and federal systems with consequent additional safety risks and administrative costs, and generally to throw parallel federal and state prosecutions into confusion and disarray."  *Thomas*, 55 F.3d at 150–51; *see also United States v. Schreane*, 331 F.3d 548, 555 (6th Cir. 2003) (explaining that the legitimacy of this prosecutorial deference "is rooted in the respect accorded to a custodial sovereign to resolve its criminal proceedings before relinquishing custody to another jurisdiction. This practice also can be understood in terms of the orderly and efficient prosecution of cases in our dual system of criminal justice.").

Here, the Government claims that compliance with the Interstate Agreement on Detainers ("IAD") was the reason for the delay after Defendant was returned to Kentucky.  (*See* ECF No. 31 at 5–6 (reasoning that two purposes of the IAD is "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints" and to "encourage minimum disruption in rehabilitative programs at the place of 'original imprisonment' and to avoid harassment by

uncoordinated shuttling of prisoners back and forth between custodial states and other states in which multiple related charges may be pending." (internal citations omitted)).)   Once Defendant was sentenced on the Kentucky charges on February 12, 2026, the Government promptly lodged the second federal detainer within a week, in accordance with the IAD.   (*See* ECF No. 31 at 5–6.) The Government also notes that binding Fourth Circuit law provides that waiting for a state court criminal prosecution to conclude is a valid reason for delay.   (*See id.* at 6 (relying on *Thomas*, 55 F.3d 144 and *Woolfolk*, 399 F.3d 590).)

Although Defendant acknowledges that "the Fourth Circuit in *Thomas* found a pending state prosecution sufficient justification . . . to deny a defendant's speedy trial motion to dismiss," he argues that his case "is much more aligned with" a nonbinding Tenth Circuit case where, *inter alia*, "there was no overlap in charges between sovereigns."   (ECF No. 29 at 5 (internal citations omitted).)   Defendant also argues that, unlike the binding Fourth Circuit cases, the present case did not involve any logistical burdens.   (*See* ECF No. 36 at 8; *see also* ECF No. 38.)   However, neither the Tenth Circuit case nor the alleged convenience in this case undermine the comity considerations set forth in *Thomas* and *Grimmond*.

At the pretrial motions hearing, Defendant also focused on the few days[7] between when he was sentenced in West Virginia state court on April 24, 2025, and when Defendant was sent back to Kentucky.   (ECF No. 38; *see also* ECF No. 36 at 8 (arguing that Defendant could have made his appearance in his case before being extradited).)   Defendant argued that the Government has not shown that it had good reason not to bring him before the Court during that time.   (ECF No. 38.)   In response, the Government claimed that it has no control over how SCRJ processes its

---

[7] At the pretrial motions hearing, Defendant claimed that he was extradited after six days, and the Government claimed that he was extradited after five days.   (ECF No. 38.)

detainers and suggested that SCRJ processed the Kentucky detainer because it was in place six months prior to the federal detainer. (*Id.*; *see also Detainers and the Correctional Process*, 1966 Wash. U. L. Q. 417, 418 (1966) ("When more than one detainer is lodged, the authority first filing usually gets custody.").)

Nevertheless, Defendant insisted that the Government could have filed a writ to have Defendant appear before this Court prior to being sent back to Kentucky. (ECF No. 29 at 2 (noting that the Government did not move for an issuance of a writ of habeas corpus ad *prosequendum* until February 20, 2026); *see also* ECF No. 36 at 8 (admonishing the Government for "allow[ing] [him] to be extradited to Kentucky and ma[king] no effort to writ him back in before this Court until February 2026"); ECF No. 38.) He reasoned that the Government could have shown plain indifference to Kentucky and brought him before this Court for his initial appearance, which would have triggered the Speedy Trial Act and allowed him to invoke his rights under the IAD to stay in federal custody. (ECF No. 38.; *but see* ECF No. 36 at 8 (claiming that the Government's "claim that it had to comply with the IAD is without merit").)

To that extent, the Government could have applied for a writ of habeas corpus *ad prosequendum*. Such a writ, which is a court order directing prison officials to immediately bring a prisoner from another jurisdiction before the court to face criminal charges, would have allowed the federal government to obtain temporary custody of Defendant, despite Kentucky's detainer. *See Stewart v. Bailey*, 7 F.3d 384, 389 (4th Cir. 1993). After all, unlike a writ *ad prosequendum*, a detainer is not a demand for temporary custody but, rather, is usually observed as a matter of interstate comity. *See United States v. Mauro*, 436 U.S. 340, 350, 358 (1978) (identifying the concept that "[a]ll jurisdictions should observe the principles of interstate comity in the settlement

9

of detainers" as one of the "underpinnings" of the IAD).   Yet, doing so would simply fail to observe interstate comity, which the Fourth Circuit has inherently recognized as a valid reason for delay.   *See Grimmond*, 137 F.3d at 828; *Thomas*, 55 F.3d at 151.

Thus, this factor weighs in favor of the Government.

### C.   *The Defendant's Assertion of his Right to a Speedy Trial*

The third *Barker* factor is whether Defendant "made a timely assertion" of his speedy trial rights.   *See Hall*, 551 F.3d at 272.   A "defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right."   *Barker*, 407 U.S. at 531–32.   Here, Defendant did not assert his right to a speedy trial until February 19, 2026, (ECF No. 31-5 at 2 (return on second federal detainer)),[8] and again on March 13, 2026, (ECF No. 13 (*pro se* motion)).   Thus, Defendant only asserted his right to a speedy trial about three months before his initial trial date of May 26, 2026.

Therefore, the third factor weighs in the Government's favor.

### D.  *Prejudice to the Defendant*

The fourth and final factor, prejudice to the defendant, weighs against Defendant.   This factor "consider[s] three interests of defendants: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'"   *Robinson*, 55 F.4th at 400 (quoting *Barker*, 407 U.S. at 532).   "The third

---

[8]  As noted above, Defendant claims he was not served with the first federal detainer.   At the pretrial motions hearing, Defendant also argued that he had no notice of this case, as he was not served with the Indictment.   (*See* ECF No. 38.)   However, Defendant acknowledged that he did know there was a federal indictment while at the SCRJ because there are jail phone records of an unknown caller who not only told Defendant that he found the federal indictment while looking for the state charge online, but also read the Indictment to him.   (*See id.*)   Although Defendant claims he did not have *federal* counsel to advise him to assert his speedy trial rights, (*see id.* (asserting that federal counsel has a specialized practice and is better equipped to represent Defendant than a good state criminal lawyer)), he had state counsel with whom he could have conferred, (*see* ECF No. 36 at 3–4).

interest is the most serious because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* (internal quotation marks omitted). The inability to adequately prepare a defense may be shown through (1) the unavailability of witnesses as a result of the delay; (2) the inability of witnesses to "accurately recall the relevant events;" (3) the loss of exculpatory evidence; or (4) evidence being "rendered unavailable by the delay. *Hall*, 551 F.3d at 273. For this factor to weigh in a defendant's favor, the defendant must establish either actual prejudice or the credible possibility of it. *United States v. Lozano*, 962 F.3d 773, 781 (4th Cir. 2020) (quoting *Ricon v. Garrison*, 517 F.2d 628, 634 (4th Cir. 1975)).

Here, Defendant appears to assert the first and third interests. (*See* ECF Nos. 29 at 6; 36 at 5–8; 38.) As to the first interest, Defendant claims that "[h]e was denied bond in Kentucky, due to his federal detainer, and essentially sat in pretrial detention for a year before entering a state guilty plea just to roll over to his federal detainer." (*Id.*) Because of this continued detention, he lost "irreplaceable time with his ailing mother." (ECF No. 36 at 8.) However, as discussed above, the second federal detainer was not lodged with BCDC until February 19, 2026, after he had already been sentenced in Kentucky. While Defendant seems to insist that his bond was denied based on the first federal detainer, (*see* ECF No. 38), the record before the Court indicates that the first federal detainer was only lodged with the SCRJ, (*see* ECF No. 31-1). Conversely, there is no evidence before the Court that Kentucky denied Defendant's bond due to a federal detainer. (*Cf.* ECF No. 36 at 3 (acknowledging that Kentucky initially released Defendant on bond after he falsely used a relative's name).)

As to the third interest, Defendant offers a number of alleged prejudices that arose as a result of his delay in getting appointed federal counsel. (*See* ECF Nos. 29 at 6; 36 at 5–8; *see also*

11

ECF No. 38.)   None of Defendant's theories, which are discussed in turn below, satisfy his burden

of showing actual prejudice or the credible possibility of it.

### 1.   Forfeiture and Procedural Notice Requirements

First, Defendant argues that his delay in getting appointed federal counsel deprived him of

legal advice regarding "forfeiture, procedural notice requirements, and similar matters."  (ECF

No. 29 at 6.)   The vague references to "procedural notice requirements" and "similar matters"

plainly fails to state any cognizable prejudice to Defendant.  His mention of "forfeiture" is more

specific, and it is possible that prejudice *could* have occurred considering the time limits on filing

a claim on forfeited property.   Nevertheless, Defendant notably does not allege that such a claim

*would* have been made if counsel had been appointed earlier.   (*See generally* ECF No. 29; 36, 38.)

Further, Defendant does not—and likely cannot—assert that such a forfeiture claim would have

any merit.   After all, the property subject to forfeiture in the Indictment amounts to two firearms

and ammunition, (ECF No. 1 at 6), which Defendant is prohibited from possessing as a convicted

felon.[9]   Thus, Defendant cannot even argue that there was a credible possibility of prejudice

regarding forfeiture.[10]

### 2.   Death of an Eyewitness

Second, Defendant argues that his defense has been impaired because "an eyewitness

alleged by [Metropolitan Drug Enforcement Network Team ("MDENT")] reports (regarding May

---

[9] In fact, Defendant claimed that the firearms subject to forfeiture do not belong to him.   (*See* ECF No. 38.)

[10] Defendant also argues that MDENT seized his vehicle incident to his arrest.   (ECF No. 36 at 7; *see also* ECF No. 40-1 at 2–3.)   He claims that due to this seizure and his detention, his "bank account became over drafted and blew up his financing with the bank."   (ECF No. 36 at 7 (stating that he is "now $17,000 behind in payments" and "is going to have to deal with that situation" once this case is over).)   However, Defendant fails to explain how an earlier appointment of federal counsel would have somehow prevented his bank account from over drafting.   (*See generally id.*; ECF No. 38.)   He similarly argues that he had another vehicle in a body shop and is being charged $300 per day for storage, "effectively rendering the car a total loss," (ECF No. 36 at 7), but does not explain how an earlier appointment of federal counsel would have prevented that from happening.

21, 2024) to have been a drug trafficking associate has now died, and is thereby unable to give testimony directly refuting certain assertions made in MDENT's case narrative." (ECF No. 29 at 7.) Evidently, this MDENT report "mentions that while conducting surveillance, MDENT agents observed an unknown black male talking to defendant in a parking lot and then conduct what appears to be a hand-to-hand transaction with an unknown white male." (ECF No. 31 at 9.) However, the Government contends that it does not know what Defendant is talking about. (*See id.* at 8–9 ("Undersigned counsel and the investigating agent are unaware of any potential witness in this case who has passed away."); *see also* ECF No. 38 (stating that, even after Defendant identified the decedent's first name and supposed relationship in his reply brief, the Government still has absolutely no idea who this witness may be).)

Defendant subsequently offered the decedent's name and his alleged relationship to this matter. (ECF Nos. 36, 38.) The decedent was allegedly the roommate[11] of the mother of the best friend of the CI. (*See id.*) Defendant does not claim that the decedent was connected to him in *any* way, with one huge exception. At the pretrial motions hearing, Defendant claimed, for the first time, that the decedent was evidently the black male in the MDENT report, who Defendant was giving money to help with a cat[12]—not anything illegal. (ECF No. 38.) Defendant also claimed that the decedent was a material witness to the CI and his best friend committing crimes

---

[11] Defendant claims that the decedent "and his girlfriend lived with the informant's best friend's mother." (ECF No. 36 at 6.)

[12] Defendant discusses his alleged "cattery" in great detail. (*See* ECF Nos. 36, 38.) He discusses his alleged registration with the State; payment of taxes; possession of "two unbred, champion female bengals" (that were supposedly worth $20,000 and $30,000, respectively); the number of kittens each cat could have; the monetary value of each prospective kitten; the registration of his cats with the International Cat Association, the disappearance of Ms. Paula Fleming ("Ms. Fleming"), along with the cats and the business records; etc. (*See* ECF No. 36 at 6–7; *see also* ECF No. 38 (comparing the price of counsel's Maine Coon cat with Defendant's bengals).) Yet, at no point does Defendant explain the decedent's role in this alleged cattery, except as an excuse as to why Defendant was giving him money during what the Government has identified as a drug transaction.

but is now unable to testify about his observations or the assertions made by the CI.   (*Id.*; *see also* ECF No. 36 at 6 (stating that the decedent could have "potentially convinced jurors that the informant was not credible").)

As the Government pointed out at the pretrial motions hearing, the decedent's alleged relationship to this case is speculative and tenuous at best.   (ECF No. 38.)   Further, Defendant's self-serving assertions, without any corroborating evidence whatsoever, are unpersuasive.  *See United States v. Hardy*, 92 F. App'x 958, 959 (4th Cir. 2004) (affirming the denial of a motion to dismiss because the defendant's "bare, self-serving allegations . . . [were] insufficient to require dismissal of the indictment"); *accord United States v. Hunter*, 197 F.3d 862, 865 (7th Cir. 1999) (affirming the denial of a defendant's motion to dismiss indictment due to alleged unfair delay because, other than the defendant's "self-serving" and "uncorroborated" claim that he was prejudiced because his substance abuse precluded him from remembering events connected to his criminal activity, there was no suggestion that defendant could not recall events surrounding his arrest and indictment); *see also Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (explaining that, in a habeas corpus proceeding, "conclusory allegations unsupported by specifics" and "contentions that[,] in the face of the record[,] are wholly incredible" should be rejected); *United States v. Lemaster*, 403 F.3d 216, 221–22 (4th Cir. 2005).

Thus, the death of this supposed eyewitness is insufficient to establish the necessary prejudice.

### 3.  Lost Contact with Other Witnesses

Third, at the pretrial motions hearing, Defendant also asserted that he has lost contact with Ms. Fleming, the alleged "primary care-giver" of Defendant's exotic cats who was also present at

Defendant's residence at the time of the search.  (ECF No. 38; ECF No. 40-1.)  Defendant claimed that Ms. Fleming could testify about different circumstances surrounding his home and what was going on instead of how MDENT interpreted it while they were doing surveillance at the time.  (ECF No. 38.)  Similarly, Defendant stated that he also lost contact with his ex-girlfriend, Ms. Tiffany Yeager ("Ms. Yeager"), who Defendant thinks could have provided testimony that would have put certain facts—albeit maybe not dispositive facts—into question.  (*Id.*)  To be clear, though, neither of these women are dead—Defendant just cannot get in contact with them right now.  (*Id.*)

Losing contact with these two individuals shows neither actual prejudice nor the credible possibility of it.   First, Defendant does not have the clairvoyance to know that his federal counsel could have made contact with Ms. Fleming, if only he had been appointed sooner.   Rather, because Ms. Fleming allegedly ran off with Defendant's expensive, exotic cats, it is unlikely that she would be answering any calls from him, regardless of Defendant's representation.   Second, even if Defendant lost contact with Ms. Yeager due to the time that passed, he offers no substantive arguments that her testimony would have benefitted his defense.

At bottom, talismanic incantation of alleged contradicting testimony alone is insufficient to establish the necessary prejudice.   *See Hardy*, 92 F. App'x at, 959; *Hunter*, 197 F.3d at 865.

4.   Lost Body Camera Footage

Defendant also claims that body camera footage was not preserved.   (ECF No. 36 at 5.)  He claims that "no body-camera or in-car footage was preserved from [his] May 21, 2024 arrest[] or the execution of the search warrant of his home."   (*Id.*)   The destruction or lack of preservation of this evidence supposedly prejudiced Defendant's defense to the extent that he could challenge

15

his arrest or the search of his residence.  (*See* ECF No. 38 (claiming that there was an illegal search of his vehicle on May 21, 2024, without any elaboration); ECF No. 40 at 1 (claiming that the lack of footage prejudices "any defense [Defendant] would put on . . . to attack the execution of the search warrant on that date").)

At the pretrial motions hearing, the Government stated that MDENT does not wear either in-car or body worn camera due to the fact that much of MDENT's work is done undercover.  (*See* ECF No. 38.)   Rather, the only body worn camera that may have existed was from when Defendant was transported from the scene of arrest to the station for processing, which would not have been preserved absent some showing of any evidentiary usefulness, such as an excited utterance.  (*Id.*)   Thus, the Government disclaimed the *creation* of body camera footage.  (*Id.*)

Defendant disagreed.   (*See id.* (arguing that MDENT operating policies are dictated by the law enforcement agencies donating officers to it, and the Charleston Police Department has a body camera policy)).   Defendant countered that there were uniformed officers involved in the search, and the execution of the search warrant was not an undercover operation, requiring secrecy.  (*Id.*) For support, Defendant points to a narrative by the investigative agent, which states that, after the search of Defendant's residence took place and Ms. Fleming was interviewed, he "then took an exit video of the residence" before "all law enforcement left."   (*See* ECF No. 40-1 at 4.)   To that extent, Defendant asserted that if this body camera footage had been preserved, it would have shown that Ms. Fleming told authorities that the firearms found on the premises belonged to her—not Defendant.   (*See* ECF No. 38.)

However, the agent's narrative statement that he took "an exit video" *after* the search of Defendant's residence does not tend to show that body camera footage of the actual search of

16

Defendant's residence ever existed.   Rather, the Government attested in open court that no body camera footage was taken.   (*See* ECF No. 38; *see also Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity.").)   Thus, if MDENT did not wear body cameras,[13] then there was no footage to be preserved, regardless of when Defendant was appointed federal counsel.   Therefore, Defendant has failed to establish the necessary prejudice by way of the lack of body camera footage.

Accordingly, because Defendant has failed to establish either actual prejudice or the credible possibility of it, *Lozano*, 962 F.3d at 781, this factor weighs against Defendant.[14]

Given the minimal weight of the first factor favoring Defendant, the remaining factors tilt the balance of the *Barker* test in the Government's favor. Accordingly, Defendant's motion is **DENIED** to the extent it is based on the Sixth Amendment right to a speedy trial.[15]

---

[13] Defendant can lament the lack of body camera footage is an alleged violation of the Charleston Police Department's policy, but "nothing suggests that a lack of body camera footage amounts to a constitutional violation or other legal deficiency."   *See United States v. Joseph*, No. 2:22-CR-00093, 2022 WL 17976790, at *7 (S.D. W. Va. Dec. 28, 2022), *aff'd*, 138 F.4th 797 (4th Cir. 2025) (Johnston, C.J.).   Further, Defendant cannot use Ms. Fleming to shield himself from liability. There is no body camera footage of the agent's conversation with her.   (*But see* ECF No. 41-1 at 4 (recounting conversation).)   Ms. Fleming is not before the Court to deny or attest to the statements Defendant attributes to her, and Defendant offers no other evidence that the firearms belonged to Ms. Fleming.   *See Hardy*, 92 F. App'x at, 959; *Hunter*, 197 F.3d at 865.

[14] Defendant also argues that he will receive additional criminal history points due to the order of his criminal proceedings.   (ECF Nos. 36 at 5–6; 38.)   Yet, this self-inflicted wound to Defendant's sentencing calculation does not qualify as a impairment to his "defense," *see Robinson*, 55 F.4th at 400 (discussing the "inability of a defendant adequately to prepare his case"); *see also* Hall, 551 F.3d at 273 (identifying the unavailability of witnesses, the inability of witnesses to "accurately recall the relevant events," the loss of exculpatory evidence, and evidence being "rendered unavailable by the delay").   Similarly, Defendant's asserted prejudice of the destruction of his alleged cattery business, (ECF No. 36 at 7), is not an impairment to his "defense" in this case.   *See Robinson*, 55 F.4th at 400; Hall, 551 F.3d at 273.

[15] Unmistakably, Defendant did not provide any argument that his Fifth Amendment Due Process rights were violated, beyond superficially mentioning it in the first sentence of his motion.   (*See* ECF No. 29.)   Thus, he failed to actually raise the issue.   Even if he had, though, this argument fails because, to establish that such right has been violated by a delay in a defendant's trial, a defendant must show, *inter alia*, that he has suffered actual substantial prejudice. *United States v. Moore*, 116 Fed. App'x 421, 422 (4th Cir. 2004); *see also Grimmond*, 137 F.3d at 827 n. 1 (stating that a defendant cannot invoke his Fifth Amendment right to due process without establishing that the delay caused him actual prejudice in presenting his defense).   As discussed above, Defendant has not shown actual prejudice in the presentation of his defense.   Therefore, his motion is **DENIED** to the extent that he could have presented an argument based on the Fifth Amendment.

17

### III.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss, (ECF No. 29), is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel,

the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:    June 8, 2026

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

18